BENAJAH ANTRIM et al., trustees of Methodist Episcopal
Church, in Pemberton, New Jersey, appellants,

*v.*

CALEB A. MALSBURY et al., respondents.

In 1824, certain lands were bought by the members of a church and dedi-
cated as a free burying-ground, under its discipline. The evidence as to the
appropriation of any lot of certain dimensions therein by an individual or
family, by direct act or by custom, is unsatisfactory. The members of the W.
family have been buried in the north end of a lot sixty-five feet in length, and
the members of the M. family in the south end, leaving a space about eleven
feet in length between the graves of the respective families. The last burial
in the north end was in 1856. M. was buried in the south end in 1878.—
*Held,* that neither the trustees of the church nor the survivors of the W.
family could legally prevent the burial of M.'s wife, who was a member of
the church, in the space mentioned and beside her husband.

The complainants are the heirs-at-law of William Malsbury,
deceased. He died in March, 1878. He was buried in the
grave-yard of the Methodist Episcopal Church, at Pemberton,
in the south end of a burial plot seven and a half feet wide by
sixty-five feet deep. His widow, Abigail Malsbury, died in
November, 1883. Preparation was made by the respondents
to bury her by the side of her deceased husband. The appel-
lants, who are trustees of said church, objected and refused to
permit such burial, on the ground that the said William Mals-
bury was buried in a lot previously appropriated by one John
Wright for his own and his family's use, and not in his own lot.

The insistment of respondents is that their father was buried
in his own lot.

The question, then, is, What portion of the free burial-ground
held by the appellant trustees did William Malsbury select for
a burial lot?

The bill alleges—

1. That in or about the year 1835, the said William Mals-
bury requested the trustees of the church and burial-ground to

set him aside such lot or plot as he should select in the church burying-ground as had not been chosen or taken by any other members of said church, and that the trustees officially assented thereto.

2. That thereupon he chose a lot " beginning at a point in the west line of said tract of land (the tract purchased of Hough in 1824) fifteen feet or thereabouts northerly from the south line of the same, and extending thence easterly about seven and a half feet, and thence northward, between parallel lines of that width, at a right angle, about sixty-five feet."

On appeal from a decree advised by Vice-Chancellor Bird, who rendered the following oral decision :

I shall dispose of this case right away. This matter was presented to me, as the counsel well know, months ago, upon the application for the injunction, and without there having been any discussion upon the real merits of the case by counsel. It was a case of some novelty, and therefore, of interest to me as a lawyer, and having been brought to my attention and having had that interest in it as a lawyer, I thought of it not a little, and it then did, and still does, present difficulties to my mind. But I will dispose of the case now because I am satisfied that no amount of reflection will entirely remove the difficulties that present themselves.

The bill is filed for the purpose of establishing the right upon the part of Mrs. Malsbury's friends to bury her by the side of her husband, in what is understood and declared by the pleading to be a free burial-ground.

It seems that in 1824 the Methodist Episcopal Church of Pemberton purchased the ground in connection with their church lot, and dedicated it to the uses of the church under its discipline as and for a free burial-ground. The deed expressly so provides.

The complainants claim that their mother should be buried in a particular place because the father and husband, in his lifetime being a member of that church, and their mother being also a

member of that church, selected a certain portion of the ground for a place of burial in this free burial-ground.

Now, there is some testimony to show that it was a custom and has been the custom to make selections of plats. There are some admissions to that effect; but the first difficulty that strikes me on that ground arises from the fact that there is no proof in the case what ground was selected by any one, how much in length or in breadth, except the effort to establish, on the part of the complainants, that Mr. Malsbury selected and appropriated to himself this particular plat, seven and a half feet by sixty-five. But a custom cannot arise from the action of a single individual. The effort of Mr. Malsbury to appropriate to himself this large plat by no means determines his right, so far as it is to be controlled or governed by the custom of the congregation, and if there was any particular custom, except to bury where the individual saw fit to bury his friends, it does not appear, except as it is admitted in the pleadings, that it has been the custom for over one hundred years (at least since the purchase of this particular plat of ground) for families to bury in plats of ground, but, as I before remarked, what dimensions those particular plats are or were does not in any sense appear. There is nothing to show, therefore, that the Malsburies had any special property, by any particular act which was in accordance with the custom, in this particular plat of ground, and whilst that may be well said of the Malsburies, and whilst it influences my mind very greatly, the same may be said of the Wrights. The Malsburies buried here and the Wrights buried here; William Malsbury buried his children to the north, and Mr. Wright, or somebody for him, buried his first and his second wife to the south of the centre line, and they buried him, Mr. Wright, still farther to the south; and not only were the Wrights buried there, but another person, Miss Differty, a relative of the Malsburies, was buried there.

Now, who shall make successful claim to this ground is an important inquiry. Shall the Wrights because their ancestors were buried there eleven feet to the south, or shall Miss Differty's friends because she was buried there?

Antrim *v.* Malsbury.

This leads me to this inquiry, in cases where testimony as to the foundation of the right claimed is no more certain and definite on the one hand or upon the other than it is here, Is there, in such cases, any other appropriation than the ground which the dead body occupies? Does a right to a free burial extend beyond the individual member of the church, who, being such member at the time of his death, is placed in a given plot, there secured beyond a peradventure from any intrusion, precisely as he would be in the pew in a free church during the time he occupies it? It is not for me to suppose what the law of the case, under other facts being proved, would be. It is my duty to ascertain the law in this particular case and to pronounce judgment. How much did the Wrights appropriate? There is not a particle of evidence that Mr. John Wright ever attempted to control one foot of that ground beyond the burial of his first and second wife. There is not a particle of evidence, as I understand it, to show that he assumed dominion over one other inch of this ground. It seems to be admitted that William Malsbury was buried on the southern extremity of this sixty-five feet, and that between his grave and the grave of John Wright are eleven feet. Whose land is that? Or who may use it for burying their dead? Can the Wrights claim it because Mr. John Wright and his two wives and a friend of the family are buried there, all eleven feet to the north? As I have inquired, did Mr. John Wright or his wife, as members of that church (supposing Mr. John Wright to have been a member), in any way ever indicate to the trustees, or ever indicate to anybody by any act whatever, that he or she claimed more than the ground which their bodies actually cover? There is nothing in the case to show that they did. Then can the children of Mr. Wright claim this eleven feet? Have they made any claim to it; have they in any way performed any act which signifies an appropriation of it? Is there any evidence that the trustees, as a board of trustees, or the president of the board of trustees, have in any way, either the one or the other, signified their assent that the children of Mr. John Wright shall have the exclusive dominion over this ground for the purpose of burial, and that for all time it is

appropriated to them and only to them? Of these things there is no proof whatever.

Now, the theory of the defence is that, Mr. Wright having been buried here, the right is secured to his children, whether they be members of that church, of any other Methodist Episcopal Church, or whether they be members of any Methodist Episcopal Church at all, whether they be within reasonable distance or miles or scores of miles away, and that they have the right to resist the burial of others there. Now, I cannot apprehend, since there is no proof before me to that effect, that it was ever the intention of the founders of this burial-ground to dedicate the ground to families from one generation to another, to parents and children and grandchildren, especially in the absence of proof that the children and the grandchildren are members of the same church. To presume such was the intention would be too violent, in my judgment. To take it for granted, without proof, that Mr. John Wright did appropriate this whole twenty-eight feet simply because he had his first wife buried there (supposing he was instrumental in securing her burial, which is stoutly resisted), I think would be equally violent in the absence of proof as to the dimensions of lots taken or appropriated generally.

Here is a lot sixty-five feet, whilst another lot has been spoken of, belonging to Abigail B. Malsbury, of only fifteen feet. Now, the observation of these facts indicates to my mind very clearly what is my duty in this case. So far as this resistance is concerned, I can see no reasonable foundation for it upon the part of the trustees. I do not understand, from the law of the case as admitted by the pleadings, the bill and the answer, that the trustees are in a position to resist the burial of Mrs. Malsbury where it is sought to bury her, by the side of her husband. Nor do I see that the Wrights have any better claim to that particular plot of ground than the trustees have. I cannot understand how Mrs. Elizabeth Wright, or any of the children or friends of John Wright, can establish, under the testimony, any claim whatever to these eleven feet of ground, and if there were nothing else whatever in the case but the absence of any appropriation or of any assertion of right of dominion in any way whatever, except

the mere burial of these four members of the Wright family, it seems to me that the defence would fail. But there is more.

The last burial was in 1856. If I remember the testimony correctly, Mr. John Wright was buried in 1856, and since that time there is nothing to establish any right or claim of right on the part of any of John Wright's family. Now, it seems to me, as already stated, that if there were nothing else in the case but the absence of any such claim, any such actual appropriation, any assertion of dominion whatever, the defence would not succeed here.

Then what is there besides in the case? The fact that William M. Malsbury, the husband, laid out this lot, graded it, made paths around it, planted trees upon it, gave consent for the Wrights to bury there, and was himself buried at the southern extremity of that lot; the fact that after another grave is made adjoining his own, there would be still eleven feet unoccupied; the fact that here is the dedication of about four acres of land for the purpose a free burial-ground; and the fact that the Malsburies were members of the church at this place, while there is no proof that the Wrights are—these facts seem to lead my mind to the conclusion that Mrs. Malsbury, having been a member of that church for so long a period of time, her husband having been a member of that church so long a period of time, and her husband having been buried there, it was a right that she should be buried by his side, there being space enough there for that purpose, and that this claim to that right is not an unreasonable one on the part of those whose religious and moral duty it was to bury her.

The trustees of the church held this land in trust as a free burying-ground. This word "free" is so well understood in the law that there can be no mistake about it. The trustees were not given any discretion. They had the power to hold, but to hold free to all, or for the benefit of all. Suppose the same word had been used in a grant of a fishery, or of a common of pasture or the like, or of a park, could there be any room for doubt as to the construction? Or, if the grant were of land and a church edifice, with a provision or condition that

it should be a free church, does it require argument to demonstrate that the first occupant cannot be unseated or crowded out by another? Would it not be mockery to maintain that in such case the trustees, or grantees, could farm out the pews or seats and select the worshippers? See *Rainier* v. *Howell, 1 Stock. 121, 129*.

I conclude, therefore, that the bill is properly filed; that the prayer should be granted, and that an injunction should go prohibiting the trustees of the church from further interfering with the burial of Mrs. Malsbury in the place designated. As I said in the beginning, the case is not free from difficulty, but as I have reflected upon it and considered the testimony and the law of the case arising from the testimony from the acknowledged facts, from those facts which are in no sense disputed, that is, that it is a free burial-ground, purchased by the members of the Methodist Episcopal Church as and for such, that here is a free place of burial in any sense and every sense, it gives the right, which I have suggested properly belongs to the friends of Mrs. Malsbury, to bury her there. I will advise such an order.

*Mr. Mark R. Sooy*, for appellants.

*Mr. David J. Pancoast*, for respondents.

PER CURIAM.

This decree unanimously affirmed, for the reasons given by the vice-chancellor.